# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**ROBERT J. WEST,**

        **Plaintiff,**

*vs.*                                   **Civil Action No. 5:04CV132**
                                        **(The Honorable Frederick P. Stamp, Jr.)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant" and sometimes "the Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Robert J. West ("Plaintiff") filed an application for DIB on April 12, 2001, alleging disability since July 6, 2000, due to a heart condition, hypertension, and obesity (R. 87, 108, 128). Plaintiff's applications were denied at the initial and reconsideration levels (R. 87, 88, 89-92, 95-97). Plaintiff requested a hearing, which Administrative Law Judge Barbara Gibbs ("ALJ") held on August 7, 2002 (R. 36-86). Plaintiff, represented by John Burris, testified on his own behalf (R. 38-75, 84-86). Also testifying was Vocational Expert Dr. Lawrence Ostrowski ("VE") (R. 75-83). On October 20, 2002, the ALJ entered a decision finding Plaintiff was not disabled (R. 18-29). On

September 21, 2004, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 7-10).

## II. FACTS

Plaintiff was born on January 14, 1959, and was forty-three (43) years old at the time of the administrative hearing (R. 108). He has a high school education and past relevant work as a meter reader, street service worker, and service technician (R. 42, 43).

On July 7, 2000, Plaintiff reported to the office of James W. Freese, M.D., with complaints of shortness of breath with cough, chest pain with nausea, vomiting, and sweating. Plaintiff's blood pressure was 148/98. Plaintiff's EKG "showed sinus rhythm with ventricular ectopic beats and STT wave changes, question anterolateral ischemia" (R. 232). Plaintiff's physical examination by Dr. Freese was for "unstable angina, rule out myocardial infarction." Dr. Freese admitted Plaintiff to Wheeling Hospital (R. 233).

H. David Millit, M.D., performed a consultative evaluation of Plaintiff when he was a patient at Wheeling Hospital. He noted Plaintiff had a history of "chest discomfort and shortness of breath" and hypertension (R. 229). Plaintiff reported to Dr. Millit that he had experienced shortness of breath while playing basketball and chest tightness when lifting weights. Plaintiff stated his shortness of breath and chest tightness occurred when he would lie down and would improve when he was not lying down. Plaintiff informed Dr. Millit he had experienced "intermittent lower extremity edema for quite some time," but he denied any "palpitations or lightheadedness" (R. 229). Dr. Millit's examination of Plaintiff revealed the following: 1) blood pressure was 180/119; 2) no hemorrhage or exudate; 3) "fairly well-preserved" carotid uptake; 4) no carotid bruits or jugular venous distension; 5) normal thyroid; 6) clear chest; 7) "point of maximal impulse . . . not well-

2

appreciated"; 8) no heaves or thrills; 9) occasional premature rhythm contraction; and 10) no murmur, rub, gallop, or click. Dr. Millit noted his impression was for "organic heart disease – atherosclerotic heart disease," chest discomfort, shortness of breath, "rule out myocardial infarction," congestive heart failure, and hypertension (R. 230).

Dr. Millit reviewed Plaintiff's July 7, 2000, EKG and noted it revealed normal sinus rhythm, left atrial enlargement, "STT changes predominantly anterolateral with "T" inversion, probably ischemic in origin, [and] premature SVE." He opined that Plaintiff's "[i]nitial CKMB and troponin I [were] normal." Dr. Millit reviewed the July 7, 2000, x-ray of Plaintiff's chest and opined it "suggests early congestive heart failure." Dr. Millit's suggested course of treatment was as follows: 1) administer nitroglycerin intravenously; 2) administer Heparin intravenously; 3) administer Lasix intravenously; 4) "[c]ardiac medications as otherwise ordered"; 5) start Plaintiff on aspirin; 6) no "beta blocker at the present time" because of Plaintiff's "apparent congestive heart failure"; and 7) echocardiogram (R. 230).

On July 10, 2000, Plaintiff underwent a left heart catheterization, which was performed by Bennett E. Werner, M.D. (R. 220-21). Dr. Werner diagnosed the following: 1) systemic hypertension, severe; 2) "markedly elevated left ventricular diastolic pressure prior to contrast load"; 3) normal coronary arteries; and 4) "no left ventriculogram performed due to abnormally elevated diastolic pressure" (R. 221).

On July 11, 2000, T. Gary Kenamond, M.D., conducted a renal consultative examination of Plaintiff. Dr. Kenamond observed Plaintiff had "some mild dyspnea" on the date of the examination. He noted Plaintiff did not smoke and drank "moderately large amounts occasionally on the weekends." Dr. Kenamond observed Plaintiff had "no prior history of cardiac or renal

3

disease or stroke" and had "developed gout" on July 10, 2000, in his left first toe (R. 217). Dr. Kenamond recorded Plaintiff's weight as 251 pounds and his blood pressure as "126 to 184 to 70 to 110." Dr. Kenamond reviewed Plaintiff's laboratory data, which revealed a "normal CBC"; unremarkable chemistries; "mildly low" magnesium; "cardiac catheterization revealed normal coronaries"; and "echocardiogram showed moderately severe impairment of LV function with ejection fraction estimated not greater than 30%." Dr. Kenamond's assessment of Plaintiff was for "severe essential hypertension," impaired left ventricular function, "hypertensive cardiomyopathy with congestive heart failure, presently compensated," history of "episodic heavy alcohol consumption," and obesity. Dr. Kenamond agreed with the doses of Lasix and Zestril prescribed, suggested the addition of beta blockers or Amlodipine to Plaintiff' medication regimen, and noted Indomethasone would "aggravate pressure in the short term" (R. 218).

On July 13, 2000, Plaintiff was discharged from Wheeling Hospital with instructions to visit Dr. Kenamond in one (1) week, Dr. Millit in two (2) weeks, and maintain a low-salt diet (R. 213).

On July 15, 2000, Plaintiff presented at Wheeling Hospital Emergency Department with chest discomfort. On July 16, 2000, Dr. Millit evaluated Plaintiff's condition. He noted Plaintiff had been admitted to Wheeling Hospital "one week ago . . . with chest discomfort syndrome." Plaintiff reported to Dr. Millit he had taken a Viagra tablet at 9:00 p.m. on July 15, 2000, and, within two (2) hours of doing so, experienced "anterior chest heaviness and some radiation to his left arm," which lasted for one-half (½) hour. Plaintiff had not experienced diaphoresis, dyspnea, reflux symptoms, shortness of breath, orthopnea, lower extremity edema, palpitations, or lightheadedness. Dr. Millit recorded Plaintiff's blood pressure as 160/105 (R. 204). Plaintiff's cardiac examination revealed "PMI [not] well appreciated"; no heaves trills, murmur, rub, gallop, or click; and rhythm

4

with occasional premature contractions. Dr. Millit opined Plaintiff had "organic heart disease – hypertensive cardiovascular disease"; chest discomfort; "rule out myocardial infarction"; and hypertension. Dr. Millit reviewed Plaintiff's July 15, 2000, electrocardiogram and observed "normal sinus rhythm, left axis deviation, probable left atrial abnormality, clockwise rotation, nonspecific ST, T wave changes with lateral 'T' inversion" and "initial CK, CKMB and Troponin I normal." Dr. Millit's treatment plan for Plaintiff was as follows: 1) discontinue intravenous Heparin that was started in emergency room; 2) taper and discontinue intravenous nitroglycerin that was started in emergency room; and 3) "cardiac medications as otherwise ordered" (R. 205).

On July 17, 2000, Plaintiff was discharged from Wheeling Hospital. Dr. Millit noted, on the discharge summary, that Plaintiff's July 15, 2000, chest x-ray revealed his cardiomegaly and tortuous thoracic aorta were unchanged. Dr. Millit opined the x-ray showed Plaintiff's lungs were clear and a "clearing in the pleural effusions and basilar air space" was evident (R. 201). Dr. Millit noted "there were no EKG or cardiac enzyme changes to suggest acute myocardial infarction." Plaintiff's discharge instructions were for him to not take Viagra and to limit his activity. Plaintiff was prescribed Lanoxin, Coreg, Norvasc, Zestril, Lasix, Micro-K, Slow-mag One, and Prevacid (R. 202).

On July 24, 2000, Dr. Freese performed a post-hospitalization examination of Plaintiff. He observed Plaintiff's weight had decreased six (6) pounds since his last visit, his "respiratory is clear," Plaintiff heart rate and rhythm were regular, and his blood pressure was 142/86. He diagnosed hypertensive cardiomyopathy. Dr. Freese opined Plaintiff's "blood pressure [was] excellent today." He noted Plaintiff had a follow-up appointment with Dr. Millit "in the next few weeks" and would discuss returning to work with him (R. 173).

5

On August 2, 2000, Dr. Freese noted Plaintiff's blood pressure was 140/112 (R. 173).

On August 8, 2000, Plaintiff was re-evaluated by Dr. Millit. Dr. Millit noted Plaintiff denied "activity-related chest discomfort." Plaintiff informed Dr. Millit that he experienced a "dull chest discomfort which comes and goes during the day and lasts a . . . couple minutes," shortness of breath if he walked "faster," and "occasional hard type heartbeat," but that he did not experience orthopnea, lower extremity edema, or lightheadedness. Plaintiff's weight was 253 pounds and his blood pressure was "140-150/105-110." Plaintiff's chest was clear and the "point of maximum impulse [was] not well appreciated." Dr. Millit increased Plaintiff's Coreg dosage, instructed Plaintiff to "continue with prudent dietary restrictions" and attempt to reduce weight. He discussed the option of a "referral to a tertiary center, noting Cleveland Clinic Foundation" with Plaintiff, and Plaintiff informed Dr. Millet he would consider the option (R. 258).

On August 9, 2000, Plaintiff was examined by Dr. Kenamond. Plaintiff informed Dr. Kenamond he was "feeling well now." Plaintiff stated he experienced "occasional brief chest pain and numbness in his left arm." Plaintiff stated he was walking daily, but he became dyspneic when he rode a stationary bike. Plaintiff's weight was 252 pounds and his blood pressure was 132/96 (sitting), 132/100 (standing), and 132/86 (rechecked/sitting). Dr. Kenamond diagnosed severe essential hypertension and noted it was "presently controlled." He also diagnosed cardiomyopathy. Dr. Kenamond agreed with the course of treatment of Plaintiff by Drs. Freese and Millit and advised Plaintiff he could return to his care as needed (R. 187).

On November 29, 2000, Plaintiff was evaluated for management of his hypertension by Kevin Ross O'Brien, D.O., and Joseph V. Nally, Jr., M.D., of the Cleveland Clinic Foundation. Plaintiff informed Drs. O'Brien and Nally that he had been taking anti-hypertensive medication for

6

"greater than five years," his blood pressure had fluctuated continuously, he experienced "occasional chest pain with exertion," he experienced "paresthesias of the hands and feet," and he had "occasional palpitations." Plaintiff denied headaches, visual changes, syncope, lightheadedness, diaphoresis, flushing, or "great fluctuation in his weight." Plaintiff stated his diet consisted "mostly of fast food." Plaintiff's weight was 118 kg (260 pounds) and his blood pressure was 142/104 (lying position) and 134/100 (standing position) (R. 298). Drs. O'Brien and Nally diagnosed essential hypertension. They opined Plaintiff needed "diet education as he has a high salt intake at this time and his current dietary habits will make it difficult to control his blood pressure." They encouraged Plaintiff to lose weight and increase his cardiovascular activities. Drs. O'Brien and Nally suggested the following changes to Plaintiff's medications: 1) Demadex be increased to 100mg (one-half tablet in the morning); 2) Lotrel 5/20mg prescribed instead of Norvasc and Diovan; 3) discontinue Cardura; and 4) Coreg appropriately "titrated as per cardiology." Plaintiff was encouraged to follow a "no-added-salt diet" and provided a food listing of appropriate and inappropriate foods "in terms of salt content" (R. 299).

On January 15, 2001, Dr. Millit performed an exercise stress echo test on Plaintiff. Dr. Millit observed the following: 1) "no chest discomfort induced by exercise, with symptomatic termination to activity secondary to shortness of breath"; 2) systolic and diastolic hypertension at rest; 3) diastolic hypertension noted during exercise; and 4) average exercise capacity (R. 269-70).

On January 30, 2001, Dr. Millit completed a physical capacities form on Plaintiff for Liberty Mutual Insurance Company. He found Plaintiff could lift and carry up to twenty-five (25) pounds, sit for eight (8) hours, walk for two (2) to three (3) hours, and drive six (6) to eight (8) hours in the course of an eight (8) hour day. Dr. Millit also found Plaintiff could frequently reach and

7

occasionally bend, kneel, climb, squat, and twist (R. 199).

On February 13, 2001, Plaintiff was evaluated by Dr. Millit. Plaintiff informed Dr. Millit he did not have "any difficulty with chest discomfort"; experienced shortness of breath only "after sex"; and had no orthopnea, lower extremity edema, palpitations, or lightheadedness. Plaintiff stated he desired to return to work. Plaintiff's weight was registered as 285 pounds and his blood pressure was 124/90 (sitting), 120/86 (standing), and 126/90 (rechecked/sitting). Dr. Millit instructed Plaintiff to continue on his current cardiac medical regimen, continue prudent dietary restrictions, and attempt to lose weight (R. 254).

On February 15, 2001, Dr. Millit corresponded with Liberty Mutual Life Assurance Company relative to Plaintiff's work status. Dr. Millit wrote Plaintiff was "able to return to work at the present time to sedentary to light activity" and that he "should avoid activity which produce[d] symptoms" or exposed him to "extremes of temperature" (R. 253).

On September 12, 2001, Plaintiff was re-evaluated by Dr. Millit. Plaintiff informed Dr. Millit that he experienced "some intermittent left thoracic to left arm discomfort, aching to sharp, occurring at rest and with activity," which lasted for two (2) to three (3) minutes, one (1) time per week. Plaintiff stated he experienced some shortness of breath with increased activity and intermittent edema in his hands and legs when standing for a few hours. Plaintiff denied palpitations or lightheadedness. Plaintiff denied tobacco use, but admitted to drinking two (2) vodka cranberry drinks every one (1) to two (2) weeks. Plaintiff informed Dr. Millit that he walked two (2) to three (3) miles per day. Dr. Millit registered Plaintiff's weight as 235 pounds and his blood pressure as 166/98 (sitting), 154/100 (standing), and 170/110 (rechecked/sitting). Dr. Millit instructed Plaintiff to decrease Coreg to 12.5mg and continue other cardiac medications as previously prescribed (R.

8

251).

On August 4, 2001, Gary W. Hinzman, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry fifty (50) pounds, frequently lift and/or carry twenty-five (25) pounds, stand and/or walk for a total of about six (6) hours in an eight (8) hour workday, sit for a total of about six (6) hours in an eight (8) hour workday, and push/pull unlimited (R. 303). Dr. Hinzman found no postural, manipulative, visual, communicative, or environmental limitations as to Plaintiff (R. 304-06). Dr. Hinzman offered the following explanation of his opinion: "There is a note from CCF, which indicated a history of AMI and low LVEF. This is not consistent with the other reports in the record" (R. 307).

On December 22, 2001, Chris Traynelis, M.D., a urologist, examined Plaintiff for "renal cysts seen on a CT scan of [Plaintiff's] chest." Plaintiff informed Dr. Traynelis that he experienced "no pain, no difficulty urinating, no dysuria, no gross hematuria, no weight loss." Dr. Traynelis opined Plaintiff's urine cytology showed no malignant cells and renal ultrasound confirmed "two small left renal cysts." Plaintiff's intravenous pyelogram was normal and a cystoscopic exam showed a normal lower urinary tract. A urinalysis showed microhematuria, which was Dr. Traynelis' diagnosis (R. 323). He opined Plaintiff "had a full workup with no worrisome finding" (R. 324).

On January 17, 2002, Plaintiff reported to the emergency department of Wheeling Hospital with complaints of chest pain (R. 333).

On January 18, 2002, Plaintiff was admitted to Wheeling Hospital by Dr. Freese due to chest pain. Plaintiff stated he had been walking on a treadmill, and, upon stopping, he experienced chest

9

pain and a pressure on his chest, which radiated to his left arm. Plaintiff reported he experienced nausea, but no vomiting. Plaintiff informed Dr. Freese he was on "long-term disability"; lived with his children; did not use tobacco; and consumed alcohol and caffeine occasionally (R. 331). Plaintiff's blood pressure was registered as 144/104. Dr. Freese's assessment was for chest pain; he opined he could not "rule out unstable angina" (R. 332).

Dr. Millit completed a consultative examination of Plaintiff on January 18, 2002. Dr. Millit noted Plaintiff had been "without chest discomfort recently." He had not been experiencing shortness of breath, orthopnea, lower extremity edema, palpitations, or lightheadedness (R. 327). Dr. Millit registered Plaintiff's blood pressure as 146/94. Dr. Millit diagnosed "organic heart disease – hypertensive cardiovascular disease"; chest discomfort; shortness of breath; hypertension; and history of thoracic aorta enlargement. Dr. Millit reviewed Plaintiff's January 17, 2002, EKG and opined Plaintiff had normal sinus rhythm, left axis deviation, and clockwise rotation (R. 328).

On February 7, 2002, Dr. Millit re-evaluated Plaintiff. Plaintiff denied any difficulty with chest discomfort. Plaintiff informed Dr. Millit he was able to walk on level surfaces without significant dyspnea, but that he became short of breath if he increased his pace, walked up a grade, or walked on a treadmill. Plaintiff experienced swelling in his hands and feet and lightheadedness if he rose too quickly. Plaintiff denied orthopnea and palpitations. Plaintiff informed Dr. Millit he consumed three (3) to four (4) glasses of wine every two weeks, but that he did not use tobacco. Plaintiff stated he walked on a treadmill "generally twenty minutes per day." Plaintiff's weight was 246 pounds and his blood pressure was 124/86 (sitting), 128/90 (standing), and "130-134/94-100" (rechecked/sitting). Dr. Millit instructed Plaintiff to continue his prescribed medications, maintain a low sodium and low cholesterol diet, and to lose weight (R. 346).

10

On February 8, 2002, Plaintiff was examined by Dr. Kenamond. Plaintiff's weight was registered as 245 pounds and his blood pressure as 132/84 and 130/90 (standing). Dr. Kenamond diagnosed essential hypertension, presently controlled (R. 314).

On February 18, 2002, Dr. Millit reported to Dr. Kenamond that Plaintiff's blood pressure was 140/100. Drs. Millit and Kenamond discussed the possibility of increasing Plaintiff's Demadex (R. 314).

On February 21, 2002, during an office visit with Dr. Kenamond, Plaintiff's blood pressure was 160/104 (sitting), 152/106 (standing), and 140/90 (rechecked/sitting) (R. 314).

On April 4, 2002, Dr. Kenamond noted Plaintiff's blood pressure was 144/90 (sitting) and 140/100 (standing). Plaintiff informed Dr. Kenamond that Dr. Millit had increased the dosage of Coreg on April 3, 2002 (R. 309).

On April 12, 2002, Plaintiff reported to Dr. Kenamond's nurse that he had experienced tingling in his feet when he sat. His blood pressure was 144/90 (sitting) and 134/92 (standing). Plaintiff's dosage of Demadex was increased from 20 to 50mg (R. 309).

On May 16, 2002, Plaintiff's blood pressure was registered by Dr. Kenamond as 146/100 (sitting), 148/100 (standing), and 170/110 (rechecked/sitting). Dr. Kenamond prescribed Hydralazine 10mg (R. 309).

On June 21, 2002, Plaintiff informed Dr. Kenamond that he felt "fine" and was tolerating Hydralazine. Plaintiff's weight was 250 pounds, blood pressure was 142/100 (sitting) and 154/106 (standing). Dr. Kenamond diagnosed hypertension with "persistent mild elevations" (R. 309).

On August 7, 2002, Plaintiff testified at the administrative hearing that he suffered side effects from Hydralazine, which he took as prescribed (two 10mg tablets twice per day). He stated

11

the medication made him sleep. Plaintiff testified the physician had informed him that Hydralazine would cause sleepiness when taken in combination with the other prescribed medications (R. 47). Plaintiff testified, when questioned by his lawyer at the administrative hearing, that he experienced fatigue from "July 2000 up to July 2001," which caused him to perform less of his chores and to sleep for different lengths of time during the day (R. 63-64). Plaintiff testified that humidity and cold air caused difficulty in his breathing (R. 64). Plaintiff testified that the diuretic, Demadex, which he was taking at the time of the administrative hearing, caused him to urinate frequently. Plaintiff also stated that his blood pressure was high and not stabilized (R. 65). When questioned by his lawyer about weight fluctuation, Plaintiff testified his weight had previously been 270 pounds, but was now 240 or 242 pounds (R. 67). Plaintiff stated that since July, 2000, his fatigue had remained the same, swelling had gotten worse, and urination had become more frequent (R. 69).

Plaintiff testified his activities of daily living included the following: he rose at 7:00 a.m.; ate a banana; took his medication; took a shower; felt the effects of the medication he had taken and fell asleep from approximately 8:00 a.m. to 10:00 or 10:30 a.m.; urinated every twenty (20) minutes for two (2) to three (3) hours upon waking; walked or exercised on the treadmill for ten (10) to fifteen (15) minutes; ate lunch; returned to sleep for one (1) to one-and-a-half (1 ½ ) hours; showered a second time; watched television; collected girlfriend from work; watched television; attended a movie once per week; ate out in a restaurant four (4) times per month; took evening medications; and retired at 10:00 p.m. ( (R. 48-53).

Plaintiff testified his son did most of the cooking and cleaning, his son completed the yard work, and his mother shopped for groceries. Plaintiff stated he would collect his prescriptions and buy "light stuff," such as milk at the market (R. 53, 56). Plaintiff testified that before he "got sick,"

12

he played basketball, played softball, bowled, fished, and "laid around and drank beer" . . . "at the

fishing hole" (R. 54). Plaintiff stated he neither received visitors nor visited with others very often.

Plaintiff testified he phoned friends to invite them to attend movies and his sister "just to chat."

Plaintiff stated he did not belong to any clubs or organizations and that he did not attend church (R.

55).

When asked by the ALJ what conditions prevented him from working, Plaintiff stated he

experienced chest pains, shortness of breath, sleepiness caused by medications, and swelling of his

feet and hands (R. 57-58). Plaintiff testified the occurrence of chest pains varied in that "two or

three weeks [would pass] and [he would ] not have one but . . . in the fourth week," he would

experience chest pain "and then I have one Monday and then I may have one again Tuesday and then

I may have [them] right back-to-back" (R. 73). Plaintiff testified he could sit comfortable for two

(2) to three (3) hours, stand for one (1) hour if he could shift his weight, walk for fifteen (15) to

twenty (20) minutes, lift no more than twenty (20) to twenty-five (25) pounds, bend to pick up an

item (with occasional light headedness resulting), reach, and climb stairs (R. 58-60).

The ALJ asked a series of hypothetical questions of the VE, to which he responded. The ALJ

asked the VE the following hypothetical: "I want you to assume a person with [Plaintiff's] age,

education and vocational profile and this person could do medium work but he would need to avoid

concentrated exposure to hazards such as unprotected heights or dangerous machinery. Are there

jobs that such a person could do?" (R. 77). The VE responded that "[t]here would be the work of

a hand packer. In the local economy, there would be 48 jobs, in the national economy . . . 102,000

jobs. There would be the work of an assembler. In the local economy, there would be 23 jobs, in

the national economy, 159,700 jobs. There would be the work of a janitor. In the local economy,

13

there would be 1,018 jobs, in the national economy, 1,600,00 jobs" (R. 76-77).

The ALJ asked the VE if there were jobs available to "a person with [Plaintiff's] education and vocational profile and age, who could do light work with the same limitation with respect to hazards?" The VE testified there were eighty (80) hand packer jobs in the local and 215,300 hand packer jobs in the national economies; seventy (70) assembler jobs in the local and 495,000 assembler jobs in the national economies; and 112 janitor jobs in the local and 179,800 janitor jobs in the national economies (R. 77). The ALJ asked the VE to name a sampling of jobs for "the same person, same age, education and vocational background who could do sedentary work with the same limitation." The VE listed the following: 1) interviewer – ten (10) jobs locally, 22,700 jobs nationally; 2) bookkeeping/accounting clerk – thirty-seven (37) jobs locally, 84,800 jobs nationally; and 3) messenger – ten (10) jobs locally, 6,900 jobs nationally (R. 78).

The ALJ further limited the first three (3) hypothetical questions in that she "added to the limitations . . . the limitation that this person should avoid concentrated exposure to temperature extremes, humidity or dampness, how would that affect the availability of these jobs?" The VE testified that the availability of jobs of hand packer, assembler, janitor, messenger, bookkeeping/accounting clerk, and interviewer would not be affected by the addition of limitations to temperature extremes, humidity, or dampness (R. 78-79).

Next the ALJ asked the VE: "if . . . this same person had to be off task at unscheduled one hour or more each day, due to the side effects or medications or fatigue, such that he requires sleep during the course of the workday, how would that affect the availability of these jobs?" The VE responded that such limitation "would preclude employment in all of the jobs" (R. 80).

Plaintiff's lawyer asked the VE if sedentary jobs would be available to Plaintiff if he were

14

required to take "bathroom breaks" every twenty (20) minutes for five (5) to ten (10) minutes (R. 81). The VE responded that such breaks "would preclude employment even in unskilled work" (R. 82). Finally, the ALJ asked the VE if employment would be precluded by a person's need to "take bathroom breaks five to 10 minutes, for two hours a day, let's say from 10 in the morning until around noon or even 12:30, through the lunch period, how would that affect the availability of these jobs?" The VE responded that such a limitation "would [not] preclude employment" (R. 83).

## III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Barbara Gibbs made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of the decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7. The claimant has the residual functional capacity to perform light work requiring no exposure to hazards (unprotected heights and dangerous machinery) and no concentrated exposure to weather extremes, humidity or dampness.

8. The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

9.   The claimant is a "younger individual between the ages of 18 and 49" (20 CFR § 404.1563).

10.  The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

11.  The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

12.  The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

13.  Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a handpacker, of which there are 215,300 positions in the national economy and 48 positions regionally; as an assembler, of which there are 495,100 positions in the national economy and 70 positions regionally; and as a janitor, of which there are 179,800 positions in the national economy and 112 positions regionally. The vocational expert testified that these jobs are a sampling of jobs the claimant could perform. He further stated that his testimony was consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT).

14.  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)) (R. 28-29).

## IV. DISCUSSION

### A.  Standard of Law

As a threshold matter, the undersigned notes Plaintiff resided in Ohio at the time of the ALJ's decision, but subsequently moved to West Virginia. Although there is scant law on the subject, the only cases the undersigned found regarding a conflict between the Circuit Courts of Appeal in a federal statute case all clearly stated the district court should apply the laws of the circuit in which it sits. See, e.g., Smith v. Shalala, 5 F.3d 547 (10th Cir. 1993) (unpublished), holding:

> Addressing Smith's second issue, Ninth Circuit case law is not applicable to matters before this court under a conflict-of-law analysis. See Chevron Oil Co. v. Huson, 404

U.S. 97, 102- 03 (1971) (when federal courts apply federal law, "ordinary conflict of laws principles have no relevance."

See also Towenson v. Apfel, 16 F.Supp.2d 1329 (D. Kan. 1998), which addressed the same issue,

citing Smith:

> This court will follow Smith and apply Tenth Circuit law, even though the better rule would seem to be to follow the law of the circuit in which the ALJ conducts the hearing, in this case the Eighth Circuit. Such a rule would allow an ALJ to look to a single circuit's case law for controlling guidance and would discourage forum shopping by claimants.

See also Svare v. Barnhart, 92 Soc. Sec. Rep. Serv. 107, 2003 DNH 92, 2003 WL 22668802

(D.N.H. 2003) ("I apply First Circuit law in resolving this action even though the plaintiff filed his

application for benefits in Minnesota which is within the Eighth Circuit."). Id at Fn. 10 (citing

Towenson.)

While, as the court stated in Towenson, it might appear the better rule would be to follow

the law of the circuit in which the ALJ conducted the hearing, in this case the Sixth Circuit, this

could lead to the result that a district court would need to defer to another circuit court's ruling, even

if that ruling was completely in conflict with that of the circuit in which he sits. See Montgomery

County Maryland v. Metromedia Fiber Network, Inc., 326 B.R. 483 (S.D.N.Y. 2005). In that

bankruptcy case, the appellant argued that the court, sitting within the Second Circuit, should apply

Fourth Circuit law, because the Fourth Circuit had a greater interest in the outcome of the case under

a traditional conflicts of law analysis (Montgomery County is located in the Fourth Circuit.) The

court, however, held the argument was "wrong as a matter of law," stating:

> A federal bankruptcy court, like a federal district court, is bound to apply federal laws as they have been interpreted by the Court of Appeals in the circuit where it sits. See, e.g., Ithaca College v. NLRB, 623 F.2d 224, 228 (2nd Cir. 1980), cert. denied, 449 U.S. 975, 101 S. Ct. 386, 66 L.Ed.2d 237 (1980)(stating that Second Circuit

decisions become the law of the circuit and are binding upon all inferior courts). By contrast, the decisions issued by other circuits on federal questions are not binding in this circuit. *See Newsweek, Inc. v. U.S. Postal Service*, 663 F.2d 1186, 1196 (2d Cir. 1981); *SEC v. Shapiro*, 494 F.2d 1301, 1306 (2d Circ. 1974). In fact, this court has recognized that "[f]ederal courts are competent to decide issues of federal law and should not be placed in the awkward position of having to apply the federal law of another circuit when it conflicts with their own circuit's interpretation." *Center Cadillac, Inc. v. Bank Leumi Trust Co.*, 808 F.Supp. 213, 224 (S.D.N.Y. 1992), *aff'd*, 99 F.3d 401, 1995 WL 736336 (2nd Cir. 1995); *see also Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) (a federal court applies the federal law of its circuit to cases transferred from other circuits); *United States v. Allah*, 130 F.3d 33, 38 (2d Cir. 1997), *cert. denied*, 524 U.S. 940, 118 S.Ct. 2347, 2348, 141 L.Ed.2d 718 (1998) (citing *United States v. Ianniello*, 808 F.2d 184, 190 (2d Cir. 1986), *cert denied*, 483 U.S. 1006, 107 S.Ct. 3229, 3230, 97 L.Ed.2d 736 (1987))("This Court is bound by a decision of a prior panel unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or this court en banc."

The undersigned, therefore, finds this matter must be decided pursuant to Fourth Circuit law.

## B. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were

18

the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## C. Contentions of the Parties

Plaintiff contends:

1.    The Administrative Law Judge's finding that Plaintiff's testimony was not credible is not supported by substantial evidence.

The Commissioner contends:

1.    Substantial evidence supports the Commissioner's decision that Plaintiff is not disabled.

## D. Credibility

Plaintiff contends the ALJ's finding that Plaintiff's testimony was not credible was not supported by substantial evidence. The Defendant contends that substantial evidence supported the Commissioner's decision that Plaintiff was not disabled. The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

19

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.

As stated above, the ALJ must first determine whether the medical evidence showed an impairment that could reasonably be expected to cause the symptoms alleged. Id. at 594. Plaintiff contends the ALJ "failed to apply the legal standard mandated by the Fourth Circuit" in that she "made no finding whether [Plaintiff] suffered from a medically determinable impairment that could reasonably cause his symptoms." (Plaintiff's brief at p. 11). The ALJ made the following finding: "At step two of the evaluation process, a medically determinable impairment or combination of impairments is severe if it significantly limits an individual's physical or mental ability to do basic work activities . . . . [T]he medical evidence indicates that the claimant has severe impairments of hypertension, left ventricular dysfunction, enlarged ascending aorta and thickened left ventricular myocardium and obesity" (R. 19-20). Defendant argues "the ALJ in this case complied with the requirements of Craig v. Chater, . . . . Although the ALJ did not specifically state that the objective medical evidence established an impairment that could reasonable be expected to produce the pain or other symptoms alleged, she expressly found that [Plaintiff] had severe hypertension, heart impairments, and obesity (Tr. 19-20)." (Defendant's brief at p. 10). In Craig, however, the ALJ

20

similarly identified severe impairments at step two of the sequential evaluation, yet the court found that his pain analysis was inadequate. Id. at 589. The Court found that the ALJ failed to "expressly consider the threshold question of whether Craig had demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain she alleges." Id. at 596. The court held that the ALJ must determine whether the objective evidence could reasonably be expected to produce "the actual pain, in the amount and degree, alleged by the claimant." Id. at 594.

In the instant case, the ALJ evaluated the evidence of record and found, at step two of the sequential evaluation, that Plaintiff had "severe impairments of hypertension, left ventricular dysfunction, enlarged ascending aorta and thickened left ventricular myocardium and obesity"; however, the ALJ did not consider the "threshold question" of whether Plaintiff's severe impairments could reasonably be expected to produce the actual pain, in the amount and degree, Plaintiff alleged, as required in Craig. Id. at 596 (R. 19-20). The ALJ's finding at step two, therefore, that Plaintiff's impairments were severe did not constitute an adequate finding under the first step of the pain analysis (R. 20).

The undersigned notes there is a serious split within the Fourth Circuit regarding this issue. The Southern District of West Virginia has held that an ALJ "must expressly consider the threshold question" of whether the claimant has an impairment that could cause symptoms resulting in pain. Hill v. Commissioner, 49 F. Supp. 2d 865 (S.D.W.Va. 1999). That court rejected the Commissioner's arguments that: 1) "the ALJ did in fact 'explicitly' perform a part 1 pain analysis by acknowledging that Claimant's impairments could and did in fact cause headaches and dizziness;" and 2) "the ALJ 'implicitly' performed a part 1 pain analysis by evaluating the actual functional limitations caused by Claimant's impairments." Id. at 868-869. Other district courts

within the Fourth Circuit, however, have held that the ALJ did not err in failing to meet the first step

of the two-step pain analysis under Craig if the ALJ 1) implicitly performed a part one pain analysis

or 2) otherwise thoroughly evaluated both the objective evidence and the subjective complaints. See,

e.g., Pittman v. Massanari, 141 F. Supp. 2d 601 (N.D.N.C. 2001), which states:

> The record contains evidence of Plaintiff's post-tibial fracture bony defect – a
> condition which *could* reasonably be expected to produce some of the pain claimed
> by Plaintiff – and thus the ALJ **essentially** found that Plaintiff could satisfy the first
> prong of the test articulated in *Craig*. However, the ALJ evaluated the "intensity and
> persistence of his pain, and the extent to which it affects his ability to work," and
> essentially found Plaintiff's subjective description of his limitations not credible.

(Emphasis added). See also Perkins v. Apfel, 101 F.Supp.2d 365, 373 (D. Md. 2000), and Ketcher

v. Apfel, 68 F.Supp.2d 629, 650-52 (D. Md. 1999). In Ketcher, the court found:

> Although the ALJ did not specifically state that the claimant's alleged pain could
> result from these medically determined impairments, it is clear that the ALJ made
> this determination since he noted that the impairments were "severe" and affected his
> functional capacity. Even if the ALJ failed to make an express finding at step one of
> the pain analysis, the ALJ correctly applied step two of the analysis.

Id. at 651 (internal citations omitted).

In the instant case, the Defendant argues that "the ALJ . . . complied with the requirements

of Craig v. Chater because, even though "the ALJ did not specifically state that the objective

medical evidence established an impairment that could reasonably be expected to produce the pain

or other symptom alleged, she expressly found that [Plaintiff] had severe hypertension, heart

impairments, and obesity . . . and "[t]he ALJ then thoroughly discussed the physical findings that led

to the determination that these conditions were severe." (Defendant's brief at p. 10). The

undersigned disagrees that the ALJ complied with the mandates of Craig because she found Plaintiff

had severe impairments and discussed the physical findings that led to that determination. The

22

Fourth Circuit, in Craig, imposed on the ALJ the duty to expressly state whether the objective evidence shows an impairment that could cause the Plaintiff's claimed symptoms at step one of the pain analysis. Id. at 596. Indeed, the Craig court held that "the ALJ's consideration of the medical evidence was more than adequate." Id. at 591. The court further found that the ALJ had reviewed all of the medical records "in painstaking detail." Id. at 592. Regardless of the ALJ's competent examination of the evidence, however, the court found his decision inadequate because he failed to address the threshold question in the pain analysis. The undersigned, therefore, finds the ALJ erred in failing to properly establish a threshold, at step-one of the pain analysis requirement, that Plaintiff's medically determinable impairments could cause the symptoms of which he complained.

The Plaintiff further contends the ALJ erred at step two of the Craig pain analysis in that she did "not address the credibility of [Plaintiff's] testimony concerning the side effects of his medication." (Plaintiff's brief at p. 11). Defendant argues the "ALJ considered [Plaintiff's] testimony in the context of the evidence of record and determined it was not totally credible for legally sufficient reasons"; specifically, it was not supported by the medical evidence, the opinions of physicians, or the results of diagnostic tests and it was inconsistent with Plaintiff's own statements about his activities of daily living, efforts to loose weight, and consumption of alcohol (Defendant's brief at pp. 10-11).

In accordance with step two of the analysis established by Craig, the intensity, persistence, and limiting effects of Plaintiff's pain and symptoms should have been evaluated by the ALJ, and this evaluation had to "take into account . . . 'all the available evidence.'" Id. at 595. All available evidence for consideration by the ALJ was Plaintiff's medical history, medical signs, and laboratory findings; objective medical evidence; evidence as to Plaintiff's activities of daily living; medical

treatment taken to alleviate pain; and Plaintiff's statements. Id. at 595.

The ALJ made the following finding as to Plaintiff's credibility: "The claimant has not been found fully credible in his allegations regarding his impairments" (R. 26). To support this finding, the ALJ reviewed, considered, and evaluated the objective medical evidence of record, medical signs and laboratory findings, Plaintiff's activities of daily living, and Plaintiff's statements.

The objective medical evidence evaluated by the ALJ relative to Plaintiff's complaints of pain was as follows:

1) Dr. Kenamond's March 16, 1998, observation that Plaintiff had been hypertensive for twenty-two (22) years, opinion that Plaintiff's blood pressure was intermittently controlled with medication, observation that Plaintiff had reported fluid retention, observation that Plaintiff's weight had increased by twenty (20) pounds, observation that Plaintiff's blood pressure was elevated, and diagnosis of hypertension and obesity (R. 21-22);

2) Dr. Kenamond's April 2, 1998, observation that Plaintiff had lost ten (10) pounds and his hypertension was improved (R. 22);

3) Dr. Kenamond's July 6, 1998, observation that Plaintiff's weight was 249 pounds and his blood pressure was elevated (R. 22);

4) Dr. Freese's opinion that Plaintiff's blood pressure was difficult to control, opinion that Plaintiff's weight had decreased, efforts to adjust Plaintiff's medication to control hypertension, follow-up treatment to Plaintiff for chest pain, and diagnosis of coronary artery disease (R. 21);

5) Plaintiff's hospitalization for hypertensive cardiomyopathy, hypertension, and congestive heart failure on July 7, 2000 (R. 20);

6) Dr. Werner's interpretation of Plaintiff's July 10, 2000, heart catheterization, diagnosis of very severe hypertensive heart disease, and prescriptions for Lasix, Diltazem, Labetlol, Lisinopril, and Minoxidil (R. 23);

7) Plaintiff's hospitalization for anterior chest heaviness with some radiation to left arm and hypertension on July 16, 2000 (R. 20-21);

8) Dr. Millit's August 8, 2000, observation that Plaintiff weighed 253 pounds and his

24

blood pressure was elevated, opinion that Plaintiff's point of maximum impulse was not well appreciated, and observation that Plaintiff's cardiac rhythm demonstrated occasional premature contraction (R. 23);

9) Dr. Kenamond's August 9, 2000, observation that Plaintiff's weight was 252 pounds and diagnosis of severe essential hypertension (presently controlled) and cardiomyopathy (R. 22);

10) Dr. Nally's November 29, 2000, diagnosis of essential hypertension, observation that Plaintiff's weight was 259 ½ pounds and blood pressure was 142/104 and 134/100, and recommendation that Plaintiff obtain diet education, lose weight, and increase cardiovascular activities (R. 25);

11) Dr. Millit's observation on January 15, 2001, that Plaintiff's blood pressure was 136/110 and 134/118 and 140/112 and 136/120 on retake (R. 24);

12) Dr. Millit's observation on January 19, 2001, that Plaintiff's blood pressure was 130/96 and 122/90 (R. 24);

13) Dr. Millit's January 30, 2001, physical capacities form, on which he wrote Plaintiff could "lift between 20 and 30 pounds, sit for eight hours a day, walk two to three hours a day, stand for four hours a day, lift/carry less than 25 pounds one hour a day, drive/travel six to eight hours a day, frequently reach and occasionally bend, kneel, climb, squat, and twist," and opinion that Plaintiff could return to work on January 19, 2001 (R. 24);

14) Dr. Millit's February 13, 2001, examination of Plaintiff, which revealed Plaintiff weighed 285 pounds, his blood pressure was 124/90 and 120/86, no evidence of carotid bruit or jugular venous distention, clear chest, no heaves or thrills, regular heart rhythm, and a not well appreciated point of maximum impulse (R. 24);

15) Dr. Millit's February 15, 2001, opinion that Plaintiff could return to work at a sedentary to light level of exertion and should avoid activities that produce symptoms or required work in extreme temperatures (R. 24);

16) Dr. Hinzman's August 4, 2001, diagnosis of heart disease and high blood pressure and findings relative to Plaintiff's physical residual functional capacity, with which Dr. Norris agreed on December 13, 2001 (R. 25);

17) Dr. Millit's September 13, 2001, observation that Plaintiff's blood pressure was 166/98, 154/100 (standing), and 170/110 (rechecked); observation that Plaintiff's weight was 235 pounds; and recommendation that Plaintiff follow prudent dietary restrictions in order to lose weight (R. 24-25);

18) Plaintiff's hospitalization for hypertension, coronary artery disease, and infected sebaceous cyst (right thigh) on January 18, 2002 (R. 21);

19) Dr. Millit's February 7, 2002, observation that Plaintiff's blood pressure was 124/86, 128/90 (standing), and 130-134/94-100 (rechecked); observation that Plaintiff weighed 246 pounds; opinion that Plaintiff's chest was clear, there were no jugular venous distention, heaves, thrills, murmurs, rubs, gallops, or clicks; notation that Plaintiff's cardiac rhythm was regular; observation that the point of maximum impulse was not well appreciated; and recommendation to Plaintiff that he continue cardiac medical regimen, maintain a low salt, low cholesterol diet, and lose weight (R. 25);

20) Dr. Kenamond's February 8, 2002, observation that Plaintiff's weight was 245 pounds and blood pressure was 132/84 and 130/90 and diagnosis of essential hypertension (presently controlled) and recent congestive heart failure (R. 22-23);

21) Dr. Kenamond's June 21, 2002, observation that Plaintiff's weight was 250 pounds and blood pressure was elevated, diagnosis of persistent mildly elevated hypertension, and prescription of Hydralazine (R. 23); and

22) Dr. Kenamond's September 21, 2002, observation that Plaintiff's weight was 230 pounds and his blood pressure was elevated, notation that Plaintiff had been walking regularly which contributed to his weight loss, diagnosis of essential hypertension, and prescription of medications in increased dosages (R. 22).

The ALJ thoroughly assessed and evaluated the objective medical evidence relative to Plaintiff's impairments. As detailed above, there is objective medical evidence of record which was considered by the ALJ that Plaintiff was prescribed and ingested medication for his hypertension and had been diagnosed with water retention (R. 21-25).

The ALJ also considered, reviewed, and evaluated the following medical signs and laboratory findings contained in the record of evidence relative to Plaintiff's complaints:

1) July 10, 2000, cardiac catheterization, which revealed severe systemic hypertension, markedly elevated left ventricular diastolic pressure prior to contrast load, and normal coronary arteries (R. 20);

2) July 15, 2000, chest x-ray, which revealed moderate cardiomegaly (R. 23);

3)      July 16, 2000, EKG, which showed no cardiac enzyme changes that suggested acute myocardial infarction (R. 20);

4)      January 18, 2002, testing performed at the emergency department at Wheeling Hospital, which was positive for low potassium levels (R. 21);

5)      Normal urinary VNA, catecholamines, CXR, renal flow scan, and CBC panel, performed between March 1997 and March 1998 (R. 21);

6)      July 13, 1998, IVP report, which was normal (R. 22);

7)      January 9, 2001 echocardiogram, which revealed increased thickness in the left ventricular ejection fraction of fifty-five (55) percent with a mild mitral valve prolapse present (R. 23);

8)      January 9, 2001, Gated Heart UGA, which revealed left ventricular ejection fraction at sixty-five (65) percent (R. 23);

9)      January 9, 2001, chest "CT scan" that revealed an enlarged ascending aorta and thickened left ventricular myocardium (R. 23);

10)     January 15, 2001, exercise stress echo test, on which Plaintiff did not reach eighty - five (85) percent of the maximum predicted heart rate due to the use of alpha/beta blockers and which was terminated because of Plaintiff's shortness of breath (R. 23- 24); and

11)     The results of Plaintiff's wearing a Holter heart monitor on March 23, 2001, which showed the presence of sinus rhythm, infrequent multiform "VEB's" occurring singly, the presence of premature "SVE's," symptoms of dull pain in Plaintiff's left arm and fingers, swelling during sinus tachycardia with significant artifact present, and presence of dull pain in left arm for five (5) minutes during normal sinus rhythm without significant repolarization (R. 24).

The ALJ thoroughly assessed and evaluated the medical signs and laboratory findings relative to Plaintiff's impairments (R. 20-24).

The ALJ also considered, reviewed, and evaluated Plaintiff's activities of daily living. She noted in her decision that Plaintiff "sleeps well" and cared for his hygiene and grooming needs without assistance" and that Plaintiff "drives and carries on a relationship with his son and a

27

girlfriend" (R. 26).

Additionally, in her decision, the ALJ adequately considered, reviewed, and evaluated the medication Plaintiff was prescribed and consumed to treat his impairments. Specifically, the ALJ noted the following:

1) Dr. Werner's July 10, 2000, prescriptions of Lasix, Diltazem, Labetlol, Lisinopril, and Minoxidil for Plaintiff (R. 23);

2) Dr. Freese's May 8, 2002, report that he treated Plaintiff's condition with a variety of hypertensive medications (R. 21);

3) Dr. Kenamond's continued treatment of Plaintiff's condition with medications (R. 22);

4) Dr. Millit's July, 2000, prescriptions of Lasix, Zestril, Norvasc, and Coreg for Plaintiff (R. 22);

5) Dr. Kenamond's September 21, 2002, prescription of medications in increased dosages (R. 22);

6) Dr. Kenamond's June 21, 2002, prescription of Hydralazine for Plaintiff(R. 23); and

7) Dr. Millit's continued monitoring and adjusting of Plaintiff's medications (R. 23, 25).

Finally, in accord with Craig, the ALJ considered Plaintiff's own statements. The ALJ considered Plaintiff's statements to Dr. Nally on November 29, 2000, that he experienced occasional chest pain with exertion, paresthesias of his hands and feet, and occasional palpitations (R. 25). She noted Plaintiff reported to Dr. Kenamond on September 21, 2002, that he was feeling well, walking regularly, and had experienced no dizziness, shortness of breath, or chest pain (R. 22). The ALJ considered Plaintiff's statement to Dr. Kenamond on June 21, 2002, that he "felt fine" (R. 23). The ALJ reviewed Plaintiff's statements to Dr. Millit on 1) August 8, 2000, that he experienced short term, dull chest discomfort during the day and shortness of breath; 2) February 13, 2001, that he

experienced shortness of breath after sex; 3) on September 13, 2001, that he drank two (2) vodka cranberry drinks every one (1) or two (2) weeks, he experienced intermittent left thoracic left arm discomfort (aching to sharp) when at rest or with activity, he experienced shortness of breath with increased activity, and he experienced intermittent edema of the hands and legs when having stood for a few hours; 4) on February 7, 2002, that he drank three (3) or four (4) glasses of wine every two (2) weeks, he experienced shortness of breath with increased pace or if he walked up grade or on a treadmill, he experienced swelling of his hands and feet, and he experienced some lightheadedness if he rose quickly (R. 23-25).

Even though the ALJ adequately reviewed, considered, and evaluated the objective medical evidence of record, medical signs and laboratory findings, Plaintiff's activities of daily living, and Plaintiff's statements of his pain and symptoms, the ALJ failed to review, consider, and evaluate Plaintiff's testimony at the administrative hearing relative to the effects of the drugs which were prescribed to him and which he consumed to treat his condition.

At the administrative hearing, Plaintiff testified that Hydralazine made him sleep from approximately 8:00 a.m. to 10:00 to 10:30 a.m. (R. 47-49). Plaintiff also testified that he experienced fatigue from "July 2000 up to July 2001," which caused him to perform less of his chores and to sleep for different lengths of time during the day (R. 63-64). Plaintiff testified that Demadex caused him to urinate every twenty (20) minutes for two (2) to three (3) hours upon waking at 10:00 a.m. or 10:30 a.m. (R. 49). Plaintiff stated that since July, 2000, his fatigue had remained the same and urination had become more frequent (R. 69).

The ALJ, in determining Plaintiff was "not . . . fully credible, at step two of Craig, found the following:

... The claimant reports that he sleeps well and cares for his hygiene and grooming needs without assistance. He drives and carries on a relationship with his son and a girlfriend. The claimant has been advised and encouraged by several treating physicians to restrict his diet and lose weight, but it appears he has not been fully compliant with these instructions. The undersigned also notes that At [sic] one point he told Dr. Millit that he wanted to go back to work, and Dr. Millit released him for sedentary to light work, with an estimate that restrictions would be removed in four to six months. It is also noted that the claimant has reported to treating physicians that he uses alcohol, and his use of alcohol has increased over time. Although the Administrative Law Judge does not find alcohol usage material to the issue of disability, the undersigned does believe this consumption is inconsistent with disabling cardiac disease and hypertension (R. 26).

The ALJ's evaluation at step two is flawed because she did not consider Plaintiff's testimony relative to the activity limitations caused by medications; therefore the ALJ failed to evaluate "all the available evidence," which included the medical treatment Plaintiff used to alleviate his symptoms and the effects thereof as mandated in Craig. Id. at 595. Even though the ALJ sufficiently reviewed, considered, and evaluated the objective medical evidence, medical signs and laboratory findings, medical treatments prescribed to and taken by Plaintiff, and portions of Plaintiff's statements about his pain and symptoms, she failed to make a determination of whether Plaintiff's testimony relative to sleep and urination was supported by that objective medical evidence, the medical signs and laboratory findings, evidence of record as to medications and treatments, or inconsistent with Plaintiff's statements. The undersigned notes the ALJ did acknowledge Plaintiff's statements about his need to sleep in the morning and his frequent urination in two hypothetical questions she asked the VE; however, she did not analyze these limitations and the resulting loss of available jobs to Plaintiff in her decision (R. 80-83).

The ALJ, in large part, based her credibility analysis of Plaintiff in step-two on his lack of compliance with his doctors' instructions to lose weight and his alcohol consumption. Plaintiff

30

asserted, in his brief, that the ALJ's finding about his not complying with his physicians' instructions to lose weight and his consumption of alcohol having increased over time is not supported by the evidence (Plaintiff's brief at pp. 13-14). The undersigned agrees. The record shows that, although Plaintiff's weight did fluctuate, he did attempt to lose weight during the time period under consideration. On Plaintiff weighed 251 pounds on July 10, 2000; 246 pounds on July 24, 2000; 285 pounds on February 13, 2001; 235 pounds on September 12, 2001; 246 pounds on February 7, 2002; 250 pounds on June 21, 2002; and 240 pounds on August 7, 2002 (R. 218, 173, 254, 251, 346, 309, 67). Additionally, the record does not contain evidence that Plaintiff increased his consumption of alcohol. On July 11, 2000, Plaintiff told Dr. Kenamond that he drank "moderately large amounts occasionally on the weekends" (R. 217). On September 12, 2001, Plaintiff informed Dr. Millit that he would drink two (2) vodka cranberry drinks every one (1) to two (2) weeks (R. 251). On January 18, 2002, Plaintiff told Dr. Freese he consumed alcohol occasionally (R. 331). On February 7, 2002, Plaintiff stated to Dr. Millit that he consumed three (3) to four (4) glasses of wine every two weeks (R. 346). None of the doctors who treated Plaintiff opined his consumption of alcohol had increased during their treatments of him. The only assessment relative to Plaintiff's alcohol consumption was Dr. Kenamond's July, 2002, notation of "episodic heavy alcohol consumption." Dr. Kenamond did not counsel Plaintiff to reduce or cease his consumption of alcohol (R. 218).

Based upon the above discussion, the undersigned finds the ALJ erred in failing to properly establish a threshold, at step one of the pain analysis requirement, that Plaintiff's impairments could, or could not, cause the symptoms of which he complained; the undersigned finds the ALJ erred in evaluating the intensity and persistence of Plaintiff's pain at step two of the pain analysis requirement because she failed to review, consider, and evaluate Plaintiff's testimony about the side

effects of his medications; and the undersigned finds the ALJ's finding relative to Plaintiff's credibility is not supported by substantial evidence.

In addition to the contention listed by Defendant in her Brief in Support of Her Motion for Summary Judgment, she asserted the May 2, 2003, letter submitted to the Appeals Council by Plaintiff did not meet all the criteria required in <u>Wilkins v. Secretary, Dept. of Health & Human Services</u>, 953, F.2d 93, 95-96 (4th Cir. 1991), because it is not material and does not relate to the relevant time period (Defendant's brief at p. 14). Because the undersigned, in the subsequent paragraph, will recommend remand of this matter to the Commissioner, the undersigned will not address the merit of the evidence but finds it is appropriate for the Commissioner to consider the proffered evidence. On remand, therefore, both parties will be permitted to submit any new evidence they determine is relevant to the issues and time frame of this case.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is not supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner for further action in accordance with this Recommendation for Disposition.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above

will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this ___9___ day of November, 2005.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE